UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

JEFF HUANG,                          )
                                     )
        Plaintiff,                   )
                                     )          No. 7:18-CV-11-REW
v.                                   )
                                     )          OPINION & ORDER
UNIVERSITY OF PIKEVILLE, et al.      )
                                     )
        Defendants.                  )

*** *** *** ***

On October 11, 2018, the Court dismissed all of Plaintiff Jeff Huang's claims against the Presbyterian Church. DE 28 (Op. & Order). The Court also dismissed eleven of Huang's thirteen claims against his former school, the University of Pikeville, and various past and present University personnel. *Id.* Following Defendants' Rule 12(c) motion, the Court dismissed Plaintiff's punitive damages claim (Count XIII) and, as to all individual Defendants, Huang's breach of contract claim (Count XI). DE 75 (Op. & Order). The University, the sole remaining Defendant, now seeks summary judgment on Huang's surviving contract claim. *See* DE 69 (Motion). The defense also pursues exclusion of Plaintiff's identified experts. *See* DE 70. Plaintiff, over two months after the applicable deadlines, *see* LR 7.1(c), has yet to respond to either motion. The motions stand unopposed.

I.      BACKGROUND

First, the players. Plaintiff Jeff Huang was formerly a student at the University of Pikeville's Kentucky College of Osteopathic Medicine ("KYCOM"). DE 69-2 (hereinafter "Huang Dep.") at 6 (Dep. at 19). For purposes of Huang's contract claim, relevant University personnel (and their roles during the subject period) include: KYCOM Dean Boyd R. Buser, Huang Dep. at 20, KYCOM Professor William Betz, *id.* at 30–31, 89, KYCOM Professor and Promotions and Matriculations ("P&M") Committee Chairman Jerry Laurich, *id.* at 24, and KYCOM Associate Dean for Student Affairs Linda Dunatov, DE 69-4 at 2 (May 18, 2011, Letter from P&M Committee).

Per the record, Huang claims contract breaches based on the following facts, described mostly from his take:

-- In February 2012, per Huang:

> [Dr. Laurich] barged up to [Huang] . . . after class one day and basically stated that, you know, "Jeff . . . you have to stay awake," in a very demeaning tone . . . and then . . . [Huang] replied and said, "I was awake." [Laurich] said, "Well, your eyes were significantly shut," . . . and then just walked off.

---

[1] The University's factual recitation is unopposed. Still, at this stage, the Court must view, and here recites the facts in the light most favorable to the nonmovant. However, "[w]hen a party does not file an opposition to a motion for summary judgment, the Court is permitted to consider the facts presented in support of the motion as undisputed and may grant summary judgment if the facts show that the movant is entitled to judgment in his favor." *Moudy v. Elayn Hunt Corr. Ctr.*, No. 14-193-JJB-RLB, 2015 WL 4772042, at *5 (M.D. La. Aug. 12, 2015); *see also Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) ("[A] non-response runs the risk of unresponded-to statements of undisputed facts proferred [sic] by the movant being deemed admitted. . . . [However, b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed. . . . And, of course, the court must determine whether the legal theory of the motion is sound. Thus, Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion . . . is unopposed.").

Huang Dep. at 112–13. Plaintiff perceived Laurich's response as intending an aspersion on Plaintiff's East Asian ethnicity. *Id.*

--      In 2013, the University established a "Student Ethics Council" (the SEC) to which it conferred authority over functions previously reserved to University personnel. DE 69-1 at 19 (Pl.'s Discovery Responses). On November 2013, the SEC president wrote Plaintiff a warning that directed him to enter the classroom using the back entrance if he arrived late for class. DE 69–22 (SEC Counseling Form). The SEC, Huang purports, allowed class members of "one particular race" late entry through the front entrance with, to Huang's knowledge, no adverse consequences. Huang Dep. at 120.

--      On November 21, 2013, Plaintiff posted a warning about potential campus gang activity on Facebook and stated: "You can guess at their demographic." DE 69-23 (SEC Counseling Form); DE 69-24 (Facebook Post). On November 25, 2013, the SEC—misquoting Plaintiff as stating "I bet you can guess their demographics"—charged Huang with making a racially-centered, derogatory, and unprofessional comment unbecoming a future doctor. DE 69-23. Defendant Dunatov denied Plaintiff's appeal and equated the violation to a prior student's posting of a female patient's genitalia on Facebook. Huang Dep. at 126–127.

--      In May 2014, Plaintiff failed a mandatory remedial Internal Medicine exam, purportedly based on eighty PowerPoint packets and a 6,400-page, two-volume textbook. *Id.* at 93–96. An excessive percentage of the exam addressed electrocardiograms—a topic minimally covered in course lectures. *Id.* The remedial exam did not coincide with the regular semester's instruction content. *Id.* Dr. Betz prepared the exam but did not teach all of the lectures. *Id.* at 129.

--      Based on Plaintiff's failed examination, Defendant Soletz (then-Dean of Promotions and Matriculation) recommended Huang's dismissal from the med school. DE 69-27 (July 8, 2014 Letter). Defendant Buser (then-Dean of the med school) upheld Soletz's decision on appeal and advised Huang that KYCOM would dismiss him unless he voluntarily withdrew. *See* DE 6-5 (Pl's Ex. E – Buser's July 25, 2014, letter to Huang). A Caucasian female student was allowed to continue at KYCOM despite failing her step 1 COMLEX exam three times. Huang Dep. at 141–42.

--      During a July 25, 2014, meeting Dean Buser advised Huang "that he had assisted another student who had failed coursework in" enrolling in another medical school. *Id.* at 135. Dr. Buser advised that he would not extend the same assistance to Huang because "he was previously burnt by the same student." *Id.* at 136. Though Dean Buser wrote Huang letters of reference, Dr. Buser, per Huang, did not "actively help" Plaintiff get into another school. *Id.* at 136–37.

## *Applicable Standard*

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

For the following reasons, under the applicable standards, and on full review, the Court finds that the record shows no triable issue as to any University breach and grants Defendant's motion.

### *Failure to Respond*

Failure to respond is not alone grounds for the Court to grant Defendant's dispositive motion. Summary judgment by default is improper. *See Miller v. Shore Fin. Servs., Inc.*, 141 F. App'x. 417, 419 (6th Cir. 2005) (*per curiam*); *see also Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017). Upon consideration of "the motion and supporting materials," the Court can grant summary judgment if otherwise proper. Fed. R. Civ. P. 56(e)(3). The Court may deem an unopposed fact admitted. *Id.* at (e)(2). A failure to respond is consequential if the precipitating motion has merit under the summary judgment rubric. *Cf. Humphrey v. U.S. Attorney Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008) ("[W]here, as here, plaintiff has not raised arguments in the district court by virtue of his failure to oppose defendants' motions to dismiss, the arguments have been waived."); *Scott v. State of Tenn.*, 878 F.2d 382 (6th Cir. 1989) ("[I]f a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the

district court may deem the plaintiff to have waived opposition to the motion. *See Elmore v. Evans*, 449 F. Supp. 2, 3 (E.D. Tenn. 1976), *aff'd*, 577 F.2d 740 (6th Cir. 1978) (unpublished per curiam).”). With no response by Huang, there is only so much heavy lifting the Court can do on its own. Defendant filed a lengthy and well-supported motion. Huang chose not to meet the arguments. Rule 56 does not burden the Court with mining the record or law for posable points in opposition.

*Relevant Documents*

Huang's operative complaint identifies “the University's catalog issued in 2010” as the only alleged contract. DE 6 (Amended Complaint) at ¶ 23. The pleading specifies no allegedly breached provision. *Id.* at ¶¶ 23, 26, 90. Plaintiff, at deposition and with his interrogatory responses, endeavored to expand on the sole pleaded theory. *See generally* DE 69-1; Huang Dep. Despite the lack of briefing and the limited pleading, the Court has done its best to glean (and address) Plaintiff's various case theories. On full review, it appears that Huang now claims he had three contracts with the University: KYCOM's 2010-11 Catalog and the 2010-11 & 2013-14 Student Handbooks. *See* DE 69-1 at 11 (Pl.'s Answer to Interrogatory No. 3) & 19 (Pl.'s Answer to Interrogatory No. 8).[2] The Court first lays out the allegedly breached provisions and then examines each, in light of Huang's allegations, to determine if the record supports any triable breach claim.

---

[2] The Court, though noting Defendant's persuasive argument as to the absence of any binding contract, will, for argument's sake, assume that *some* provisions of the relevant documents include provisions that bound the University. *See Centre College v. Trzop*, 127 S.W.3d 562, 568 (Ky. 2003) (“The relationship between a private college and its students can be characterized as contractual in nature.”); *Suhail v. Univ. of the Cumberlands*, 107 F. Supp. 3d 748, 755 (E.D. Ky. 2015) (“The nature of an implied contract between a University and its students is determined by looking at the ‘brochures, course offering bulletins, and other official statements, policies and publications of the institution.’” (citation omitted)). The Court will take up the thrust of Defendant's argument as to contract formation where necessary to the ultimate decision.

Because, under the applicable standards, Huang established no genuine dispute as to the University's breach of any binding obligation, the Court grants Defendant's motion.

*Relevant Provisions*

Per the record, Huang's various breach theories rely on the following provisions:

The '10 Handbook's "Notice of Nondiscrimination":

> [KYCOM] complies with the policy of Pikeville College that no student shall be excluded from participating in, be denied the benefits of, or be subjected to discrimination in any program sponsored by this educational institution because of age, gender, race, color, creed, religion, handicap, sexual orientation, or national origin.

DE 69-5 at 9; Huang Dep. at 114 (Laurich comments); *id.* at 129–32, 140 (Betz remediation and P&M appeal); *id.* at 123 (SEC tardiness handling); *id.* at 135 (Dr. Buser's alleged failure to assist); DE 69-1 at 19 (alleging a "[p]ossible pattern of discriminatory behavior that would contradict" the nondiscrimination notice); *see also* DE 69-37 at 9 ('10 Catalog's identical version); Huang Dep. at 120 (referencing identical '10 Catalog and '10 Handbook non-discrimination provisions regarding the SEC's tardiness handling).

The '10 Handbook's "Professionalism" statement:

> The physician's highest commitment is to the care of his/her patients in the spirit of beneficence, nonmaleficence, confidentiality, and altruism. Further, these tenets undergird the profession of osteopathic medicine's social contract with society in that physicians place their patients' interests above their own, the profession establishes and maintains standards of competence for professional practice, and ethics and integrity are the cornerstones of physician practice. For osteopathic medicine, these foundational beliefs define its practice of medical professionalism.
>
> PCSOM students learn and begin to practice medical professionalism through the knowledge, understandings, and experiences they encounter throughout the PCSOM curriculum, student organizations and clubs, and related activities. In the clinical setting, students are afforded occasions to witness and practice competency, professionalism, and the embodiment of

the osteopathic medical code of ethics. PCSOM students are expected to conduct themselves in a professional and ethical manner befitting the honorable profession that they are entering. Students have an obligation to maintain the highest standards of integrity with regard to their behaviors.

DE 69-5 at 7 (relevant portions quoted); Huang Dep. at 118 (alleging creation of SEC was "[p]ossibly" a violation); *see also* DE 69-19 at 5–6 ('13 Handbook's identical version); Huang Dep. at 129 (citing '13 version regarding Betz's teaching obligations); *id.* at 135 (citing '13 version regarding Dr. Buser's alleged failure to assist); DE 69-37 (cross-referencing the '10 Handbook for "[m]ore specific information concerning [Professionalism] expectations").

The '13 Handbook's "Attendance" policy:

Student attendance at all lectures, labs, discussion groups, and other assigned functions is mandatory and may be monitored. There must be appropriate reason and documentation for any absences. Further, a pattern of unexcused absences may be referred to the Promotion and Matriculation Committee.

DE 69-19 at 25; Huang Dep. at 128 (Betz remedial exam); *see also* DE 69-5 at 23 ('10 Handbook's identical version).

The '13 Handbook's Student Ethics Council's purpose statement:

As future physicians, student doctors at Kentucky College of Osteopathic Medicine (KYCOM) will be held to the highest ethical standard. The students at KYCOM will embody the principles of integrity, accountability, and mutual respect. The Student Ethics Council (SEC) exists under the auspices of the KYCOM Student Government Association (SGA) to promote and uphold the principles and practices of medical professionalism outlined in the KYCOM Student Handbook and to encourage a self-governing student body. Members of this council will promote ethical and professional development of KYCOM students through various means that include medical student orientation and other educational opportunities. Furthermore, the SEC will maintain the highest level of confidentiality among students, treat each student justly, and foster an environment of student professionalism at KYCOM. (KYCOM Student Ethics Council Bylaws, 2012).

*See* DE 69-19 at 31; Huang Dep. at 121 (possible bias in tardiness handling); *id.* at 123 (Facebook incident confidentiality).

> The '13 Handbook's replication of KYCOM's student honor code:

> I shall not . . . [p]rovide incorrect information to another person about any matter with the intent that another student's academic performance be harmed as a result.

DE 69-19 at 31; Huang Dep. at 126–27 (Dunatov comparison).

## II.     ANALYSIS

In Kentucky, "[t]o prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville / Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). However, and "[n]otwithstanding the existence of a contract, Courts are generally hesitant to intervene in the affairs of academic institutions." *Suhail*, 107 F. Supp. 3d at 755. This is "especially" true "in actions challenging the institution's academic regulations, since the courts possess minimum expertise in this area." *Lexington Theological Seminary, Inc. v. Vance*, 596 S.W.2d 11, 14 (Ky. Ct. App. 1979). With these baseline principles in mind, the Court turns to Huang's claims.

Initially, the Court rejects out-of-hand any complaint theory untethered to an alleged contract provision. Without, at the barest minimum, identifying an allegedly breached provision, no juror could reasonably find in Huang's favor on Count XI. *Cf. Streets v. Putnam Inc.*, No. 2:13-CV-803, 2014 WL 1922817, at *2 (S.D. Ohio May 14, 2014) (dismissing contract claim where plaintiff "failed to identify any contractual provision that defendants allegedly breached"). The Court arrives at a like conclusion

regarding Huang's breach allegations based entirely on (tentative) speculation. *See, e.g.*, Huang Dep. at 121 ("<u>If</u> there's any personal bias . . . they can <u>possibly</u> target me[.]") (emphasis added); *id.* at 124 ("one of the students <u>possibly might have</u> had some influence"). If the Plaintiff, himself, fails to affirmatively allege actually breaching conduct, and submits no other supporting proof, no reasonable juror could find in his favor. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 585 (6th Cir. 1992) ("[C]onclusory allegations unsupported by specific evidence are insufficient to establish a genuine issue of material fact."); *Staunch v. Continental Airlines, Inc.*, 511 F.3d 625, 628–29 (6th Cir. 2008) ("It is not sufficient for the party opposing summary judgment to present a 'mere scintilla' of evidence; the evidence must be such that a reasonable jury could find in her favor."); *Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment.").

*'13 Handbook*

Plaintiff, at his deposition, regularly claimed breaches of the '13 Handbook as grounds for his contract claim. The Court, for several reasons, rejects any claim relying wholly[3] on the '13 document. First, Huang pleaded no breach of contract based on the '13 Handbook. *See generally* DE 6.[4] "[A] plaintiff may obtain relief on an unpleaded theory of recovery only if he proves that theory, he bases it on the wrongful act alleged in the complaint, and the defendant receives fair notice of the theory." *Yoder v. Univ. of*

---

[3] The Court excepts from this analysis Huang's claim premised on the '13 Handbook's "attendance" policy; the relevant provision is identical to the '10 Handbook version. *See* DE 69-5 at 23

[4] Notably, Plaintiff's only mentioned the '13 Handbook in his pleading to claim that the language in the "handbook defining professional standards was and is **unconstitutionally vague and overbroad**[.]" DE 6 at ¶ 35.

*Louisville*, 417 F. App'x 529, 530 (6th Cir. 2011) (citations omitted). Unpleaded claim recovery is authorized under Federal Rule 54(c), which, in relevant part, provides that a "judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Thus, for any unpleaded '13 Handbook claim to form a recoverable, triable theory, the factual predicates for such a claim must be fairly traceable to the complaint allegations. *Bluegrass Ctr., LLC v. U.S. Intec, Inc.*, 49 F. App'x 25, 32 (6th Cir. 2002) ("The essence of a claim is its factual elements. ").

Given the operative pleading's content, the Court sees no basis for inferring any Huang intent to bring a contract claim premised on the '13 Handbook. Indeed, any claim that Huang and the University formed a valid contract via the '13 document directly contradicts Huang's sole pleaded contract claim. *See* DE 6 at ¶¶ 23–26. Huang alleged that the University's conferral of authority to the SEC constituted a material, breaching alteration of the alleged '10 contract. *See* DE 6 at ¶ 26. The '13 Handbook explicitly recounts the SEC's role. In fact, Plaintiff relies on the '13 document's SEC provisions as proof of the alleged unauthorized prior alteration, *i.e.*, to support the pleaded claim. *See* DE 69-1 at 11 (Pl'.s Answer to Interrogatory No. 3, at ¶ 2). The complaint theory, of SEC establishment as breach, cannot logically coexist with any claim that the '13 Handbook constituted a binding contract between the University and Huang. If Huang assented to the '13 Handbook's terms, he agreed to the SEC's handling of student complaints. *See* DE 69-19 at 32. Thus, any claim that the '13 Handbook constituted a binding contract is not reasonably or logically traceable to Huang's complaint. Accordingly, Plaintiff's

unpleaded breach claims premised on the '13 Handbook's SEC purpose statement[5] and replication of the student honor code[6] provide no basis for relief.

Moreover, even if such claims were properly pleaded or sufficiently founded on complaint allegations to justify Rule 54(c) consideration (and, again, they were not), Defendant would be entitled to summary judgment. For starters, the Court sees no binding University obligations in the subject provisions. Huang's '13 Handbook theories rely on provisions regarding "the **Student** Ethics Council" that, per the referenced section, "exists under the auspices" of the **Student** Government Association ("SGA"). *See* DE 69-19 at 31 (emphasis added). Per the '10 Catalog, the '10 Handbook, and the '13 Handbook, the SGA is "the official voice for all **students**." DE 69-5 at 11 (emphasis added); DE 69-19 at 11; DE 69-37 at 36. The SEC's purpose statement reflects its goal of encouraging "a **self-governing student body**." DE 69-19 at 31 (emphasis added). In short, the clear thrust of the relevant (**Student**) Handbook sections is governance of student conduct.

Though the "relationship between a private college and its students can be characterized as contractual in nature[,]" *Centre College*, 127 S.W.3d at 568, "[a] party to a contract cannot breach the contract by failing to do something that the contract does not require [it] to do." *Rich for Rich v. Kentucky Country Day, Inc.*, 793 S.W.2d 832, 834 (Ky. Ct. App. 1990). The referenced provisions of the '13 Handbook do not create

---

[5] *See* Huang Dep. at 121 (possible bias in tardiness handling); *id.* at 123 (Facebook incident confidentiality).
[6] Huang Dep. at 126–27 (Dunatov comparison).

binding **University** obligations.[7] *See Ali v. Univ. of Louisville*, No. 3:17-CV-00638-RGJ, 2019 WL 539098, at *9 (W.D. Ky. Feb. 11, 2019) ("[Plaintiff] has not put forth any evidence demonstrating that the University intended to be bound by the documents' provisions, and thus the Student Handbook is better understood as a unilateral policy manual."); *Furtula v. Univ. of Kentucky*, 438 S.W.3d 303, 308 (Ky. 2014) ("Basic contract law provides that, as in the case of an express contract, an implied contract requires the agreement of the promisor to be bound." (footnotes omitted)). Thus, Huang's contentions that the SEC failed to act "justly" in handling tardiness complaints, Huang Dep. at 121, or that the SEC failed to "foster[ ] an environment of professionalism and level of confidentiality among students" in requiring him to publicly apologize, *id.* at 123,

---

[7] Indeed, the Court doubts that aspirational statements of a student government sub-entity can be plausibly be read as a legally valid contractual obligation of any kind. *Cf. Fleming v. U.S. F.B.I. Detroit MI Field Office*, No. 09-13449, 2010 WL 431725, at *3 (E.D. Mich. Feb. 2, 2010) (holding a community college's "mission statement is not a binding contract"); *Green v. Sandy*, No. 5:10-CV-367-JMH, 2011 WL 4688639, at *4 (E.D. Ky. Oct. 3, 2011) ("[T]he Court is not immediately persuaded that the handbook could ever be understood as a contract. It is a unilateral policy manual which states that EKU 'reserves the right to alter, amend or modify this handbook at any time without prior notice.' As with handbooks in the employment context, 'in order to constitute a contract, . . . the handbook must contain specific language showing EKU's intent to be bound by the handbook's provisions.'" (citations omitted)).

present no fairly debatable question of breach as to any contractual obligation owed to Plaintiff by the sole Defendant remaining in this case, the University.[8]

Huang's claim that Dean Dunatov violated the Student Honor Code's statement regarding provision of inaccurate information fails for the same reason. *See* Huang Dep. at 126–27. That is, the relevant language, DE 69-19 at 31, cannot be plausibly read as establishing any University obligations. *Cf. Cent. Baptist Hosp. v. May*, No. 2015-SC-000005-WC, 2015 WL 5655615, at *3 (Ky. Sept. 24, 2015) ("To constitute such a contract there must, of course, be a mutual assent by the parties—a meeting of the minds—and also an intentional manifestation of such assent." (citations omitted)). Additionally, the Honor Code's terms suggest no intent to circumscribe the conduct of the alleged breaching actor, Dean Dunatov, a non-student. *See* Huang Dep. at 127 (Huang conceding that the subject language governs conduct of "students"). Thus, the alleged Dunatov statements support no actionable breach inference.

For these reasons, the University is entitled to summary judgment on any breach claims premised on the '13 Handbook. Next, the Court considers Huang's claims regarding the alleged 2010-11 contracts.

---

[8] Further, the Court notes that the disciplinary acts that form the basis for many of Huang's breach allegations were based on **signed** Huang admissions of misconduct. *See* DE 69-22 & 23 (Signed Counseling Forms); Huang Dep. at 74–76 (Huang confirming signature and agreeing that it is "unprofessional to be late to class"); *id.* at 85 (confirming signature). Though Huang, at deposition, disputed the voluntariness of one such signature, *id.* at 85, Plaintiff, by failing to respond here, waived any argument as to the Court's consideration of these signed concessions. *See Humphrey*, 279 F. App'x at 331; *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to . . . properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion[.]"). "A contract between an educational institution and a student is only enforceable so long as the student complies with the college's rules and regulations." *Centre College*, 127 S.W.3d at 568. Thus, Huang, having admittedly breached KYCOM rules, could not now enforce contractual rights regarding the process of discipline for such violations.

First—The University's creation of the SEC. Huang contends that the University violated the '10 agreements by establishing the SEC without his signed consent and entrusting the SEC with "significant authority" for "functions performed solely by the University administrators and faculty members" under the '10 documents' terms. *See* DE 6 at ¶¶ 24-26; DE 69-1 at 11 & 19. Huang suggests that the University's creation of that body was either (1) a unilateral "material alteration" of the '10-'11 contracts or (2), perhaps, a violation of the '10 Handbook's "Professionalism" provision. DE 6 at ¶¶ 24–26; DE 69-1 at 19; DE 69-5 at 7 ("Professionalism" statement); Huang Dep. at 118 (alleging creation of SEC was "[p]ossibly" a violation). Neither theory holds water.

The '10 Handbook's first page states that the University "reserves the right to make any changes to the content of this document at any time without advance notice." DE 69-5 at 3. The '10 Catalog addresses professionalism under the heading of "Student Policies[.]" *See* DE 69-37 at 28–29, 31. The Catalog provides that such policies are (A) described in greater detail in the Student Handbook, (B) that the Handbook is "published annually[,]" and (C) that the University "reserves the right to amend existing policies or to establish new policies at any time without prior notice." *See id.* at 28–29. Finally, the '10 Handbook's "Guidelines for . . . Professionalism" provide:

> It is understood that these policies may not cover every situation. . . . Further, with regard to student policies, [the University] reserves the right to amend existing policies **or establish new policies at any time without prior notice**.

DE 59-5 at 23 (emphasis added). Thus, these documents, if contracts they were, clearly authorize the University to unilaterally alter policy. Thus, the creation of the SEC did not breach any Huang-KYCOM deal.[9]

Second—The "Notice of Nondiscrimination[.]" DE 69-5 at 9. Huang alleges four possible breaches of this provision. Huang Dep. at 114 (Laurich comments); *id.* at 129–32, 140 (Betz remediation and P&M appeal); *id.* at 123 (SEC tardiness handling); *id.* at 135 (Dr. Buser's alleged failure to assist). Plaintiff has not clarified whether he believes the allegations constitute direct or circumstantial proof of discrimination. Indeed, neither party offers a proposed framework to govern analysis of a contract-embedded discrimination theory. However, Defendant does credibly argue that Huang failed to show a discriminatory breach. *See, e.g.*, DE 69 at 20, 22–23. Facing a properly disputed essential claim element, Huang, to reach a jury, needed to establish a genuine dispute as to breach. In this context, that means Huang needed to offer proof from which a juror could reasonably find that the University discriminated against him. To guide the inquiry, the Court, lacking party input, falls back on well-established principles to evaluate Plaintiff's discrimination claims. *See Patterson v. McLean Credit Union*, 109 S. Ct. 2363,

---

[9] As to Huang's hesitant allegation that the formation of the SEC was unprofessional, the Court, like Huang, is less than "completely certain" (to say the least) how the University's conduct could have breached the referenced provision. Huang Dep. at 118. Huang does not elaborate on his theory, and the Court sees absolutely nothing unprofessional in a medical school allowing its students (and future physicians) to, at least initially and with the Associate Dean for Student Affairs advising, evaluate allegations of misconduct lodged against peers. *See* DE 69-19 at 30-31 (listing the Associate Dean as an advisory SEC constituent); *see also id.* at 33 (providing procedure for presenting complaints regarding "mistreatment" to senior University personnel). [Huang, evidently not then doubting the system's professionalism, also pledged to adhere to the KYCOM Student Honor Code, including its SEC complaint-referral mechanics. *See* DE 69-21 at 13 (Signed Honor Code).] Huang establishes no triable breach question on this alternative SEC-formation theory.

2377 (1989) (holding *McDonnell Douglas* applicable to § 1981 contract discrimination claims and finding that "this scheme of proof, [is] structured as a 'sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination'"), *overruled on other grounds by* Pub. L. 102–166, § 101; *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky. 2005) ("Absent direct evidence of discrimination, Plaintiff must satisfy the burden-shifting test of *McDonnell Douglas*[.]").

Regarding his exchange with Dr. Laurich, again, Huang claims:

[Dr. Laurich] barged up to [Huang] . . . after class one day and basically stated that, you know, "Jeff . . . you have to stay awake," in a very demeaning tone . . . and then . . . [Huang] replied and said, "I was awake." [Laurich] said, "Well, your eyes were significantly shut," . . . and then just walked off.

Huang Dep. at 114 (Laurich Comments). Assuming the truth of Huang's tale, this exchange does not amount to direct evidence that the University subjected Huang to discrimination based on any impermissible trait. "To qualify as direct evidence, the evidence must connect the motivating animus to the adverse action without relying upon inferences[.]" *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 577 (Ky. 2016).

Put differently,

"Direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor." [*Umani v. Michigan Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011)]. It is "'evidence from the lips of the defendant proclaiming his or her . . . animus.'" *Diebel v. L & H Res., LLC*, 492 F. App'x 523, 526 (6th Cir. 2012) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998)).

*Hannon v. Louisiana-Pac. Corp.*, No. 3:17-CV-00922, 2018 WL 6102940, at *4 (M.D. Tenn. Nov. 21, 2018).

Here, the alleged Laurich remarks would require, at least, *some* deductive effort to arrive at the relevant discriminatory sequitur. Dr. Laurich—the Chairman of the Promotions & Matriculations Committee[10] and, thus, well aware of Huang's academic troubles prior to this '12-'13 incident—stated that he believed Plaintiff had been sleeping in class and advised him that he had to stay awake. When Huang denied the allegation of sleeping, Laurich seemingly identified the observed basis for his prior belief, *i.e.*, that Plaintiff's eyes were "significantly shut." The Court has little trouble concluding that an inference would be necessary for a juror to connect Laurich's comment to an impermissible ethnic bias. *See, e.g.*, *Charalambakis*, 488 S.W.3d at 577 (rejecting as direct proof of discriminatory animus "allegations that [University Provost] had derisively commented upon [plaintiff's] accent").[11]

None of Huang's other discrimination allegations warrants consideration under the direct evidence rubric and, thus, the Court considers each within the venerable *McDonnell-Douglas* framework. Assuming *arguendo* that Huang made out a prima facie case of discrimination, Plaintiff offers nothing to rebut Defendant's proffered non-discriminatory explanations for any of the various interactions. *Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club*, LLC, 204 F. App'x 528, 536 (6th Cir. 2006) (characterizing step two production burden as "extremely light"). As to the Laurich

---

[10] Huang Dep. at 24.

[11] Huang prefaced his narrative by stating: "I'm Asian, so my eyes are going to naturally look squinted; from a distance, they can look closed." Huang Dep. at 112. Huang's testimony is illustrative of the inferential hoops a juror would have to work through to conclude that Laurich's statements were an insidious allusion to Huang's ethnicity. That is, a juror would have to not only disbelieve the explanation inherent in the exchange, *i.e.*, that Laurich was not simply stating why he believed that Huang was asleep, but also infer that Laurich was obliquely referencing Huang's anatomical makeup and then connect that indirect mention to ethnic animus.

exchange, Huang presents nothing beyond his own speculation to cast doubt on Defendant's explanation. *See* DE 69 at 26–27. Thus, the claim would falter at *McDonnell Douglas* step three. *Chappell v. GTE Prod. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of [ ] discrimination.").

Huang likewise fails to advance *any* proof, save self-serving conjecture, that Dr. Betz's administration of and the P & M Committee's response to the remedial exam amounted to discrimination. *See* Huang Dep. at 129–132. Huang, for instance, states that he "isn't sure if . . . the same test [ ] was administered" for Plaintiff and another student attempting to remediate the same course. *Id.* at 130. Huang professed a desire to see Dr. Betz's history of disciplinary actions in search of discriminatory patterns. *Id.* Plaintiff had months to uncover such proof and, ultimately, presents nothing to support his discrimination hypothesis. *See id.* at 132 (conceding lack of supportive evidence); *id.* at 140 (same).[12]

The same is true of Plaintiff's claim regarding his feeling that the SEC's treatment of his tardy class appearances was, somehow, disparate and ethnically or racially driven. *See id.* at 119–120, 123. Plaintiff was able to identify only one alleged student that arrived late to class and conceded that he had no idea whether (or how) the SEC handled any other student's tardiness. *Id.* at 123.

Huang's discrimination claim regarding Dean Buser's alleged failure to "actively" help him get into another school is, if anything, even thinner on the details. First, Huang

---

[12] Dr. Betz's affidavit, explaining that he "administered the same remediation exam" to all remediating students and that his grading of Huang's exam did not "differ from the . . . grading for any other student[,]" stands unopposed. DE 69-26 at 4.

did not back his complaint allegation that the student Dean Buser previously assisted was "Caucasian." *Compare* DE 6 at ¶ 55, *with* Huang Dep. at 135–36.[13] Instead, Huang attributed the alleged refusal to assist to Buser's being "previously burnt" by a student that he helped and Buser's assumption that Huang would end up the same way. Huang Dep. at 136. The Court sees nothing in this record that offers even the barest hint that any impermissible animus drove Dean Buser to decline any Huang request for aid. Further, and foundationally, Plaintiff conceded that Buser wrote multiple letters of reference on Huang's behalf. Huang Dep. at 136. Nonetheless, Huang insists that Buser "did not actively help me get into another school." Huang Dep. at 137. [Of course, *writing* supportive letters is, by any reasonable interpretation, *active* aid.] The fact that Buser did not provide as much assistance as Huang wished or, perhaps, had provided other students previously, falls well short of establishing a triable question of discrimination or contract breach.

Final notes regarding Huang's scattered disparate treatment allegations (*see, e.g.*, Huang Dep. at 122–23, 130, 133): First, most of the allegedly favored students remain, on this record and nearly two years after complaint filing, completely anonymous. Second, and despite the (unverified) complaint's bald claims regarding similarity,[14]

---

[13] Unverified complaint allegations offer Huang no aid under the summary judgment rubric. *Whitehead v. Bowen*, 301 F. App'x 484, 487–88 (6th Cir. 2008) (To overcome a well-supported Rule 56 motion, a plaintiff cannot "rely merely on allegations or denials in his own pleadings; rather, his response must—by affidavits or as otherwise provided in Rule 56—set out specific facts showing a genuine issue for trial." (citations omitted)); *Thomas v. City of All.*, 52 F.3d 326 (6th Cir. 1995) ("While the allegations in a verified complaint have the same force and effect as an affidavit in responding to a summary judgment motion, *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir.1993), the amended complaints in this case were not verified.").

[14] *See* DE 6 at ¶¶ 28–29, 38, 50–53, 55. Again, unsworn pleading contents will not overcome a well-supported summary judgment motion.

Huang offers no **proof** that any referenced student was "similarly situated" with anything approaching the specificity that the cases require for creating "an inference of disparate treatment[.]" *Kentucky v. Solly*, 253 S.W.3d 537, 542 (Ky. 2008) (citation omitted). Plaintiff presents no comparative analysis (or evidence) to show similitude "in all relevant aspects" between Huang and the allegedly favored students. *Bd. of Regents of N. Kentucky Univ. v. Weickgenannt*, 485 S.W.3d 299, 308 (Ky. 2016). Nor does Huang offer proof that any proposed comparator "engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." *Univ. of Kentucky v. Carpenter*, No. 2015-SC-000384-DG, 2017 WL 3634481, at *3 (Ky. Aug. 24, 2017). Generally, Huang claims little more than distinctions regarding demographic characteristics and broadly analogous (mis)conduct.[15] *See, e.g.*, Huang Dep. at 123 (four classmates allegedly permitted to enter and exit class at will were "Caucasian"); *id.* at 142 ("female and white" classmate was "allowed to continue" despite "academic difficulties throughout her career"). Such generalities provide no foundation for a reasonable juror inference of discriminatory disparate treatment. Thus, Huang's desultory contentions on this front offer no basis for a reasonable juror to find a discrimination-based contract breach.

In sum, Plaintiff's speculative, unsubstantiated theories establish no grounds for a juror to conclude that the University discriminated against Huang (or anyone else). Without a triable discrimination allegation, Huang has no viable claim for breach based on the anti-discrimination provision.

---

[15] The limited facts that Huang alleges regarding an identified classmate, Wendy Abbott, actually distinguish her circumstances from Plaintiff's. *See* Huang Dep. at 141. Huang, relying on hearsay, alleges that Ms. Abbott thrice failed the COMLEX Exam. *Id.* at 141–42. Yet, Plaintiff passed that exam on his first attempt. *See* DE 6-6 at 1.

<u>Third</u>—The "Professionalism" statement. DE 69-5 at 7. Huang alleges two breaches of this provision.[16] Huang Dep. at 129 (citing '13 version regarding Betz's teaching obligations); *id.* at 135 (citing '13 version regarding Dr. Buser's alleged failure to assist).

The Court sees no basis for construing the subject provision as establishing any University obligations. The first two paragraphs identify general hortatory goals for physicians. *See* DE 69-5 at 7. They include no inkling of the University expressing any intent to be bound. *Furtula*, 438 S.W.3d at 303 ("To constitute such a contract there must, of course, be a mutual assent by the parties—a meeting of the minds—and also an intentional manifestation of such assent."). The final paragraph does set forth some arguably binding standards of conduct. *See* DE 69-5 at 8. However, by their terms, the stated "expect[ations]" and "obligation[s]" are expressly directed to "PCSOM **students**." *Id.* Moreover, the University prefaced the subject section by reserving "the right to make any changes in its . . . policies and requirements with or without advance notice." *Id.* at 7. On these facts, the Court finds that no reasonable Handbook reader could interpret the "Professionalism" statement as expressing a contractual obligation of a University Dean or Professor. *Cf. Easley v. Univ. of Michigan Bd. of Regents*, 627 F. Supp. 580, 586 (E.D. Mich. 1986) ("No one can reasonably rely on statements of academic regulations contained in" a "booklet that cautions:" *e.g.*, "The information contained in this Bulletin is subject to change at any time.").

Further, even if Dean Buser or Dr. Betz were bound to comply with the Professionalism statement. Nothing in that provision can be read to bar assignment of

---

[16] In addition to the already rejected SEC formation contention, *see supra* n. 10.

teaching responsibilities to other (undisputably)[17] qualified faculty, or to mandate "active[ ]" assistance for former students seeking to enroll in other med schools. Huang Dep. at 129, 136–37. Again, a contracting party cannot breach by engaging in conduct the agreement does not bar or by failing to act in a way the contract does not require. Thus, no jury could reasonably find for Huang based on an alleged breach of the "Professionalism" statement.

Fourth—The "Attendance" policy. DE 69-5 at 23. Huang claims that Dr. Betz's failure to teach all of the internal medicine classes violated the Handbook's Attendance policy. Huang Dep. at 128. The Court sees no triable issue as to contract formation or breach on this basis. The relevant provision falls under the heading of "Guidelines for **Student** Conduct and Professionalism[,]" and by its terms governs "Student attendance[.]" DE 69-5 at 23. On this record, no reasonable juror could find that the policy created a binding obligation for the University or for Betz, a non-student.

<em>Additional Claim Deficiencies</em>

The Court, for completeness, notes a couple of other proof deficiencies. First, as to breach, Huang's sole surviving claim is against the **University**; the Court has granted the individual Defendants' Rule 12 motion on the contract claim. *See* DE 75. Huang's breach theories facially rely on acts of individuals, not official University conduct (excepting, perhaps, the establishment of the SEC). While some of the alleged individual conduct could arguably be attributed to the University, Plaintiff, as to the acts relied on, has not made the attribution argument under any recognized agency theory.[18]

---

[17] *See* DE 69-26 at 4 (Betz Affidavit describing assignment procedure).
[18] *See, e.g.*, Restatement (Third) Agency § 1.01 (2006) (defining "Agency"); *id.* at § 2.03 ("Apparent Authority"); *id.* at § 4.01 (defining "Ratification").

Additionally, for Huang to recover on any breach theory, he would need to show "damages flowing from the breach of contract." *Abma*, 326 S.W.3d at 8. Plaintiff's proof as to damages of any kind is reedy to non-existent. The record includes only bare allegations of damages: (1) Huang claims "undue stress" and, perhaps, (2) loss of earnings as a physician. *See* DE 69-1 at 12, 19. Huang links his stress claim to only one alleged breach: the University's creation of the SEC. *Id.* at 19. As to lost income, Plaintiff ties his allegation to the now-dismissed Count XIII. DE 69-1 at 12. Thus, as to most of his theories, Huang fails to claim <u>any</u> damages "flowing from" the purported breaches. Moreover, for any claimed emotional distress damages, Kentucky generally requires presentation of "expert medical or scientific proof to support the claimed injury or impairment." *Osborne v. Keeney*, 399 S.W.3d 1, 17–18 (Ky. 2012). Huang presents no affirmative evidence "concerning any severe emotional distress" the University (or its personnel) caused. *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 545 (Ky. Ct. App. 2013).

These factors lend additional support to the Court's conclusion that summary judgment is, on this record and under the applicable standards, appropriate.

## III.    CONCLUSION

Because the University carried its initial burden, Huang had to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *see also id.* at 2257 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production [by] either . . . submit[ting] affirmative evidence that negates an essential element [or by] demonstrate[ing] to the Court that the nonmoving party's evidence is

insufficient to establish an essential element[.]" (emphasis in original)). This he failed to do. Accordingly, "Rule 56(c) mandates the entry of summary judgment[.]" *Celotex Corp.*, 106 S. Ct. at 2552.

For these reasons, and under the applicable standards, the Court **GRANTS IN PART** DE 69, on terms, and **ORDERS** as follows:

1. The Court **GRANTS** the University of Pikeville summary judgment on Plaintiff's contract claim (Count XI);

2. Given and accounting for the DE 75 rulings, the Court otherwise **DENIES** DE 69 as moot;

3. The Court **DISMISSES** Plaintiff's Count XI **WITH PREJUDICE**;

4. Based on the Rule 56 result, the Court **DENIES** Defendant's motion in limine (DE 70) as moot; and

5. The Court will enter a separate judgment.

This the 12th day of November, 2019.

Signed By:

*Robert E. Wier*

**United States District Judge**